IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MONICA GRACIE GONZALEZ, and<br>SALVADOR MENDOZA,<br>Defendants. | No. 3:09-cr-00115-JAJ<br><br><br><br>**ORDER** |

This matter comes before the Court pursuant to Defendant Monica Gracie Gonzalez's motion to suppress all "fruits" of a search of her residence. Gonzalez filed her motion on April 7, 2010 [Dkt. No. 61] and Defendant Salvador Mendoza[1] filed a motion to join on April 9, 2010. The government filed a response on April 21, 2010 [Dkt. No. 75] and the defendant replied on May 3, 2010. [Dkt. No. 84.] The Court held a hearing on this motion on May 26, 2010, and permitted the defendant to supplement its reply. [Dkt. Nos. 94 & 99.] The Court denies the motion to suppress.

The defendant's motion to suppress challenges the warrantless invasion of the curtilage of her residence. She asserts that the Court should suppress all "fruits" of the illegal entry resulting from discovery of a hydraulic press on her back deck. The discovery of the press was part of the justification for a warrant issued later that day. The government contends that it was justified in a limited invasion of the curtilage and that the plain view exception to the search warrant requirement applies. It further contends that even if the entry onto her curtilage was unlawful, there was probable cause to otherwise obtain the search warrant for her residence. The Court makes the following findings of fact and conclusions of law.

---

[1] Hereafter, when the Court refers to "defendant," it references only Monica Gonzalez, as she is the filer of this motion. The Court notes that it did grant Salvador Mendoza's motion to join at the hearing held on May 26, 2010.

I. FACTS

Law enforcement agents visited the residence of the defendant on the morning of October 14, 2009. The defendant had earlier been identified by an informant as a cocaine supplier and/or trafficker. Several weeks before October 14, 2009, agents had identified the property and confirmed with the defendant's neighbors that this was the defendant's residence. When the agents came to her property in October, they intended to question her as to whether the informant's information about cocaine being on site was accurate.

The defendant's residence is a single-wide trailer located in a rural area at 3035 Rhinestone Drive, Riverside, Iowa. Assessor's records indicate that the trailer is fourteen feet wide with front and back decks attached to the residence. The trailer sits on a 2.5 acre lot, encircled on three sides with a wooden fence and on one side with a wire fence that runs along an embankment. There is an opening in the wooden fence to allow for an unpaved driveway. According to aerial photos offered into evidence by the government, there are two circular driveways or worn vehicle paths on the property. One is a driveway that appears partially paved that makes a loop near the front door of the residence. The other branches off from the main driveway and goes along and around the left side of the trailer, emerging on the right side to connect again with the main driveway. The larger route encircling the residence appears as if it is a vehicle path worn into the grass.

On the morning of October 14, 2009, agents testified that there were two cars parked outside the residence—a black Mercedes with a Maryland license plate and a red pick-up truck with an Illinois license plate registered to Arthur Gallegos.[2] There was a third car at the residence that appeared to be inoperable. At approximately 11:00 a.m. after knocking on the front door of the trailer, the agents walked around to the back entrance. There was no extra backyard fence, gate, or other such things exhibiting more

---

[2] "Gallegos" is one of Defendant Mendoza's aliases.

than the usual concern for privacy that people have in their back yards. In the agents' experience, this type of trailer commonly had a back door staggered to the left of the front door. The agents thought to knock on the back door—as the two cars out front were registered to out-of-state residents—because the agents thought someone was home and might not hear a knock at the front door. To access the back door, the agents used the steps on the back deck. Special Agent Dan Stepleton and Agent Shawn Morgan testified that the back deck did not have a gate or any other impediment to entry. Photographs introduced into evidence by the defendant clearly show a closed gate on the deck. Both agents testified that this gate was not there on the morning of October 14, 2009. The Court finds the testimony of the agents convincing, as the photograph was taken at some unknown, but later time as there is snow on the ground in the photograph.

As agents approached the rear door, they observed a large, free-standing metal object sitting on the back deck partially covered with a translucent plastic sheet secured by a bungee cord. The large metal object was approximately five to six feet tall. Special Agent Stepleton testified that the plastic cover was the same width as the object and was covering approximately half of it. Because the sheet was not transparent, Special Agent Stepleton looked underneath the cover. Testimony by Special Agent Stepleton confirmed that upon initial inspection, he and other agents did not touch or move the cover.[3] He credibly testified that it was a windy day and despite the bungee cords securing the bottom of the cover, he was able to clearly see the words "30-ton hydraulic press" on the metal object. Special Agent Stepleton immediately recognized the metallic object to be a 30-ton hydraulic press used by cocaine traffickers to compress cocaine into bricks after it has been diluted. Again, no one answered the back door after Special Agent Stepleton knocked for approximately forty-five seconds. He then left the premises in order to get a search

---

[3] A truly cursory inspection of an object, which involves merely looking at an object that is already exposed to view, is not a "search" for purposes of the Fourth Amendment. *Arizona v. Hicks*, 480 U.S. 321, 325 (1987).

warrant. Other agents remained in the area, although not on the property, to secure the residence.

Some time afterwards, co-defendant Salvador Mendoza and two others arrived at the trailer. The group drove their car on the grass path around to the back of the residence. Agent Morgan testified that the men used the back door to enter the residence. The police drove around the house from the other direction. The agents detained the men at the residence.

At approximately 8:30 p.m., the agents executed a state search warrant on the residence. This warrant relied in significant part on the agent's discovery of the 30-ton hydraulic press on the premises. This search resulted in the recovery of approximately 3 1/2 kilograms of cocaine, currency, and drug paraphernalia. As a result of the search the agents arrested the defendant at her place of work. Prior to her arrest the defendant made oral statements to the agents, which the government also seeks to introduce against the defendant.

## II. STANDARD

Federal Rule of Criminal Procedure 12(b)(3)(C) states that a motion to suppress evidence must be raised before trial. FED. R. CRIM. P. 12(b)(3)(C). See also *United States v. Spotted Elk*, 548 F.3d 641, 653 (8th Cir. 2008). The court must review a pretrial motion unless it finds good cause to defer a ruling. FED. R. CRIM. P. 12(d). The preponderance of evidence standard for a pretrial ruling denying a motion to suppress is lower than the reasonable doubt standard required for a jury to convict. *United States v. Dembry*, 535 F.3d 798, 800 (8th Cir. 2008).

In addition, because there was warrantless entry onto the curtilage, the government has the burden of proof that a plain view exception to the warrant requirement is met. *Ark. v. Sanders*, 442 U.S. 753, 759–60 (1979).

III. ANALYSIS

The defendant argues that the agents improperly intruded upon the curtilage of the property. After no response at the front door, the defendant asserts that the agents were constitutionally prohibited from approaching the residence in any other manner. She contends that when the agents accessed the back door of the trailer, they were impermissibly intruding upon the curtilage, or protected area, of the residence. The defendant claims that because the police could not lawfully approach the rear of the residence, their observation of the hydraulic press must be suppressed. Thus, the defendant contends that the Court must suppress all "fruits" resulting from the unlawful entry into the protected area of the curtilage. This includes the discovery of the metallic press, the results of the state search warrant, and the oral statements the defendant made to the police before her arrest.

The government makes with three points in its argument that the evidence resulting from the entrance onto the curtilage should not be suppressed. First, the government argues that it was reasonable for the agents to walk around to the back door of the residence. The agents were legitimately on the premises. The government asserts that the discovery of the hydraulic press satisfies the elements of a plain view search. Second, the government contends that even if the information discovered from the back door area was excluded from the affidavit in support of the search warrant, there was still probable cause for the issuance of a search warrant.[4] Lastly, the government argues that the good faith

---

[4] The government states that the defendant's residence had been identified by an informant as a place where cocaine was dropped, unwrapped, diluted, packaged, and then distributed. Information also established that the person leading the operation, Defendant Mendoza, drove a red pick-up truck. The defendant was also tied to distributing kilograms of cocaine earlier in the year. Additionally, an informant stated that agents would be able to recover between eighteen to twenty pounds of cocaine at the residence. Accordingly, the government argues that pursuant to the totality of circumstances test, *Illinois v. Gates*, 462 U.S. 313, 238 (1983), the affidavit still had sufficient probable cause for the issuance of a search warrant even without information about the hydraulic press.

exception to a subsequently invalidated search warrant applies because the agents acted in objectively reasonable reliance on the search warrant.[5] For these reasons, the government urges the Court to deny the motion to suppress.

The Fourth Amendment of the Constitution protects against both unreasonable searches and unreasonable seizures. U.S. CONST. amend. IV. According to the Supreme Court, a search "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). There is a "societal understanding that certain areas deserve the most scrupulous protection from government invasion." *Oliver v. United States*, 466 U.S. 170, 178 (1984) (citing *Payton v. New York*, 445 U.S. 573 (1980)). Evidence obtained in violation of the Fourth Amendment may be subject to exclusion. *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007). This exclusionary rule is equally applicable for direct and indirect fruits of a constitutional violation, including verbal statements. *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). "When the issue is whether challenged evidence is the fruit of a Fourth Amendment violation, the defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence." *Marasco*, 487 F.3d at 547 (internal citations omitted). It is with this background that the Court examines the privacy rights inherent in the curtilage of the defendant's trailer.

### A. Curtilage

The defendant claims that the backyard and back deck to her residence is curtilage and is protected from unreasonable search by the Fourth Amendment. The Court must determine if the agents' presence in the backyard was an unlawful invasion of the defendant's reasonable expectation of privacy so that any evidence observed in plain view

---

[5]*United States v. Leon*, 468 U.S. 897 (1984).

was the fruit of an illegal search. *See Katz v. United States*, 389 U.S. 347, 351–52 (1967). The defendant has the burden to prove that she had a legitimate expectation of privacy in the back deck area and backyard as a part of her residence's curtilage. *United States v. Pinson*, 24 F.3d 1056, 1058 (8th Cir. 2004).

The curtilage of a residence is protected by the Fourth Amendment. *Hester v. United States*, 265 U.S. 57, 59 (1924). Curtilage is "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Oliver*, 466 U.S. at 180 (internal citations omitted); *see also United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir. 1977). The curtilage area is protected under the Fourth Amendment as a place in which the occupant has a reasonable expectation of privacy which society is prepared to accept. *See Dow Chem. Co. v. United States*, 476 U.S. 227, 239 (1986); *United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006). Curtilage is normally land adjoining a house or land within some type of enclosure. *See United States v. Boyster*, 436 F.3d 986, 991 (8th Cir. 2006) (citing BLACK'S LAW DICTIONARY 411 (8th ed. 1999); *see also United States v. Gerard*, 362 F.3d 484, 487–88 (8th Cir. 2004) (presence of a fence between the primary residence and another area typically means that area is outside the curtilage)). The private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself. *United States v. Molkenbur*, 430 F.2d 563, 566 (8th Cir.), *cert. denied*, 400 U.S. 952 (1970). However, "no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways." *United States v. Khabeer*, 410 F.3d 477, 481–82 (8th Cir. 2005) (quoting *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984)); *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1005 (8th Cir. 2010) (same).

There are several factors that determine whether an area is considered part of the

curtilage of an individual's residence, such that the area falls under the "umbrella" of the Fourth Amendment. *United States v. Dunn*, 480 U.S. 294, 300–01 (1987). These factors are: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301; *see also Gerard*, 362 F.3d at 487; *United States v. Mooring*, 137 F.3d 595, 596 (8th Cir. 1998); *McDowell v. United States*, 383 F.2d 599, 603 (8th Cir. 1967); *Boyster*, 436 F.3d at 991. According to the Eighth Circuit, an unlawful invasion of a reasonable expectation of privacy requires a dual approach to the analysis: "whether the agents' observation was made in a place to which [the defendant's] expectation of privacy could reasonably be said to extend; and, second, if so, whether the agents' intrusion was justified by 'some . . . legitimate reason to being present unconnected with a search directed against the accused.'" *Anderson*, 552 F.2d at 1299–1300 (quoting *Coolidge v. N.H.*, 403 U.S. 443, 466 (1971)).

In terms of whether an intrusion is justified, the Fourth Amendment allows a warrantless entry into the curtilage where there is a legitimate law enforcement objective. *United States v. Weston*, 443 F.3d 661, 667 (8th Cir. 2006) (citing *United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001)). For example, an initial intrusion into curtilage is justified with an intent to knock and announce. *Anderson*, 552 F.2d at 1300; *Lakoskey*, 462 F.3d at 973 (legitimate investigatory purposes). In *Weston*, officers proceeded past an unlocked gate at the end of a driveway. *Id.* Once at the front door, the police officers intended to "knock and announce" their presence, to inquire about stolen vehicles, and to request consent to search the property. *Id.* (citing *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001)). Once on the property and past the gate, the police officers viewed incriminating discoloration on some propane tanks in plain view. *Id.* The court found that based upon this "limited, good-faith entry into the curtilage in furtherance of a legitimate

law enforcement objective, [the entry] was not unreasonable". *Id.* Despite the defendant's argument that this case does not present an "issue" relevant to this case, the Court finds that *Weston* illustrates the baseline for entry into curtilage. Entry into any curtilage, whether it be the front or backyard area of a residence, must be "limited" and in "good faith." *Id.*

Here, the Court must determine whether the agents intruded upon the defendant's curtilage and whether the intrusion was justified. The Court examines the area alleged to be curtilage in light of the *Dunn* factors. *Dunn*, 480 U.S. at 301. First, the back deck is attached to the residence and in close proximity to the home. The back deck area and backyard are an extension of the home. As to the second factor, there is a fence—of an indeterminate height[6]—that surrounds the residence. This enclosure signals to the outside world that the resident has an expectation of privacy for her entire 2.5 acre lot. Also, there is a well-traveled grassy driveway that curves around the residence and goes directly by the deck. Additionally, there are not things like a sidewalk or paving stones leading from the front of the residence to the back deck. As to the back deck, there was no gate or enclosure reasonably limiting or intimating to a person not to enter the back deck. No additional fence on the property or any "no trespassing" signs are posted. Third, the nature of the uses to which the area is put appears to be domestic because of the attachment to the home and because the fence surrounds the residence with only an opening for the driveway. The final factor, steps taken by the resident to protect the area from observation, is indeterminate. There is a wooden fence enclosing the entire 2.5 acre lot, but nothing that separately encloses the backyard. On balance, the Court finds that the back deck and backyard area is curtilage of the residence and that the defendant had a legitimate expectation of privacy in that area.

---

[6] Photographs introduced into evidence by the defendant do tend to demonstrate that it is a typical wooden fence built for privacy.

Whether the intrusion into the backyard is an unlawful entry is a close question. The facts in *Anderson* and *Raines* provide guidance for the Court because the agents there also entered the backyards of the residences. In *Anderson*, after agents arrived at the residence they rang the doorbell and knocked with no response. *Anderson*, 552 F.2d at 1298. There was a light on in the house and a barking dog inside. *Id*. The agents then walked around the house to access the back door to see if someone was home. *Id*. On their way, they observed through a lighted basement window—partially covered by a shade—stolen television sets in their unopened boxes. *Id*. The court determined that going around to an alternate entrance was not an unreasonable invasion of privacy. *Id*. "We cannot say that the agents' action in proceeding to the rear after receiving no answer at the front door was so incompatible with the scope of their original purpose that any evidence inadvertently seen by them must be excluded as the fruit of an illegal search." *Id*. at 1300.

Likewise, the court found in *Raines* that a "limited intrusion [into the backyard] was justified". *Raines*, 243 F.3d at 421. A deputy sheriff came to the residence with the intent to serve process on an individual. *Id*. at 420. No one answered a knock at the front door. *Id*. Because there were many cars parked at the residence, the deputy thought someone might be in the backyard who could not hear the knocking. *Id*. The deputy then walked through a ten-foot wide opening in debris that was surrounding the perimeter of the house. *Id*. He observed marijuana plants growing near the residence and "immediately left the premises without seizing any of the plants and sought a search warrant." *Id*. at 420–21. The court found that the sheriff had made a "limited intrusion" into the curtilage, but that this intrusion was permissible because he had a legitimate objective of serving process. *Id*. at 421. "[L]aw enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence." *Id*.

The defendant nevertheless argues that *Raines* and *Anderson* are inapposite to the facts presented here. She contends that "no walkway or path lead[s] to the backyard or

the back deck" and that "[t]here is simply no express or implied invitation for visitors to go beyond the front door." She cites to *State v. Kruse* for the proposition that it is a violation of the Fourth Amendment to enter curtilage for the purpose of an ongoing violation. *State v. Kruse*, 2010 WL 153794, at *1 (Mo. App. W.D. Jan. 19, 2010). Moreover, the court in *Lollie v. State*, with a near-identical fact pattern to this intrusion of curtilage, found that Florida law strictly protected privacy interests in side and backyards. *Lollie v. State*, 14 So.3d 1078, 1079–80 (Fla. Ct. App. 2009). In sum, the defendant argues that *Kruse* and *Lollie* rebut *Raines* and *Anderson* in that the agents were not in a place where they had a right to be when the press was observed.

The Court finds that *Kruse* is only superficially helpful to the defendant. The court in *Kruse* cites *Raines* with approval, and *Kruse* was factually distinct from *Raines*. In *Kruse*, it was shortly after midnight, not plain daylight, when the police officers entered the curtilage, seemingly without any exigency for conducting a search. *Kruse*, 2010 WL 153794, at *6. Officers also accessed the backyard before knocking on the front door. *Id.* at *7. The court found that the "intrusion [in *Raines*] was arguably less than in this case because it was daylight and the deputy sheriff was merely seeking to serve process [in *Raines*]." *Id.* at *6. In a similar fashion, the Court will not find against the government's intrusion on the curtilage based on the Florida law cited in *Lollie*. *Lollie*, 14 So.3d at 1079.

Here, the Court has found that the enclosed backyard area is curtilage of the home. The fence enclosed the perimeter of the residence and did not bar visitors from entering the backyard once someone was on the premises. *See Kharbeer*, 410 F.3d at 482. This lack of a barrier made the backyard area accessible to visitors. *Id.* In this case, there was also a grass driveway that curved around the house, indicating perhaps, that the resident uses the back door as an entrance. Additionally, it is oftentimes necessary to knock on multiple doors of homes, as a traditional "front door" may not actually be used by the

11

resident as the main entrance. *See e.g.*, *Hart v. Aurora Loan Servs., Inc.*, 285 Fed. Appx. 313, 314 (8th Cir. 2008) (foreclosure notices posted on front and back doors); *United States v. Thomas*, 430 F.3d 274, 276 (6th Cir. 2006) ("Two officers knocked on the back door of [the] home, which served as the primary entrance to the home according to local police."). Several circuits, including this one, have held that it is reasonable for law enforcement officers to enter curtilage in order to knock at an alternate entrance, *see*, *e.g.*, *Anderson*, 552 F.2d at 1299–1300; *United States v. Titemore*, 437 F.3d 251, 259 (2d Cir. 2006) (sliding glass door is a "principal entranceway, which has associated with it a diminished expectation of privacy"); *Alvarez v. Montgomery County*, 147 F.3d 354, 356 (4th Cir. 1998) ("[t]he Fourth Amendment does not prohibit police, attempting to speak with a homeowner, from entering the backyard when circumstances indicate they might find him there."); *United States v. Garcia*, 997 F.2d 1273, 1279 (9th Cir. 1993) ("officers must sometimes move away from the front door when they are attempting to contact the occupants of a residence"); *United States v. Morehead*, 959 F.2d 1489, 1496 (10th Cir. 1992) (presence of multiple vehicles gave officers a reason to believe defendant on premises and "the mere act of walking to the back of the house cannot be considered unreasonable"); *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990) (if the front "door is inaccessible there is nothing unlawful or unreasonable about going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person."), or to "circle" a home and "move away from the front door" in order to contact the residents that might be inside. *United States v. Hammett*, 236 F.3d 1054, 1060 (9th Cir. 2001) (citing *United States v. Garcia*, 997 F.2d 1273, 1279 (9th Cir. 1993)). Courts similarly share the view that when a resident fails to answer the front door, it is permissible "upon [the officer] not receiving an answer, [to] proceed[] to the back door." *Hardesty v. Hamburg Township*, 461 F.3d 646, 654 (6th Cir. 2007) (citing *Estate of Smith v. Marasco*, 318 F.3d 497, 520–21 (3d Cir. 2003)); *United States v. Bradshaw*, 490 F.2d

1097, 1100 (4th Cir. 1974); *Anderson*, 552 F.2d at 1300; *Hammett*, 236 F.3d at 1060).

The Court finds that there was a sufficient indication that someone might be home for a police officer to knock at an alternate entrance. The presence of several cars at the residence made it reasonably likely for a police officer to believe that someone was home. *Raines*, 243 F.3d at 420. Because of Special Agent Stepleton's stated familiarity with the layout of single-wide trailers, it was entirely reasonable for the agents to try an alternate entrance once no one answered at the front door. They also left the curtilage area after no one answered the back door. With an investigatory purpose in mind and cars at the residence, the Court finds that it was a reasonable and "limited intrusion" for the agents to knock at the back door of the residence. *Anderson*, 552 F.2d at 1298. Once the agents discovered that no one was home, the agents did not remain in the backyard. It is reasonable for an officer to initially enter a backyard to determine if a defendant is home. *Estate of Smith*, 430 F.3d at 157. Accordingly, the government has met its burden to show that the agents were in a place where they had the right to be when they discovered the 30-ton hydraulic press.

### B. Plain View

The Court next considers whether the 30-ton hydraulic press was in the agent's plain view when he invaded the curtilage area. Pursuant to the plain view doctrine, an "observation made by a police officer from a position where the officer is entitled to be is not a 'search' within the meaning of the Fourth Amendment." *United States v. Johnson*, 506 F.2d 674, 675 (8th Cir. 1974), *cert. denied*, 95 S.Ct. 1579 (1975). *See also United States v. Martin*, 806 F.2d 204, 206 (8th Cir. 1986) (when an item is in plain view, there is no "search" in the meaning of the Fourth Amendment). Without a warrant, a police officer may seize an item that is in: (1) plain view; (2) when it is observed from a lawful vantage point; and (3) where the incriminating character of the item is immediately

13

apparent. *United States v. Banks*, 514 F.3d 769, 773 (8th Cir. 2008) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)). An object in plain view does not violate a reasonable expectation of privacy. *Horton*, 496 U.S. at 133. Next, the incriminating character of an item is apparent when there is "probable cause to associate the property with criminal activity." *Raines*, 243 F.3d at 422; *United States v. Garner*, 907 F.2d 60, 62 (8th Cir. 1990), *cert. denied*, 498 U.S. 1068 (1991). "The plain view doctrine allows law enforcement officers to seize evidence without a warrant when the initial intrusion is lawful, the discovery of the evidence is inadvertent, and the incriminating nature of the evidence is immediately apparent." *Raines*, 243 F.3d at 422 (citing *United States v. Beatty*, 170 F.3d 811, 814 (8th Cir. 1999)).

Here, Special Agent Stepleton did not immediately seize the 30-ton hydraulic press. Rather, he used the presence of the 30-ton hydraulic press in his affidavit securing a state search warrant. The Court analyzes whether this limited entry onto the curtilage satisfies the three-prongs of seizing an item that is located in plain view. *Banks*, 514 F.3d at 773. The press had a plastic cover partially obscuring it, but the agents could see portions of the press underneath the cover. Standing on the deck next to the hydraulic press, Special Agent Stepleton saw the "30-ton hydraulic press" label. Next, the agents observed the press from a lawful vantage point, as the Court previously found. The discovery was inadvertent, as the agents were on their way to knock on the back door. Lastly, the agents both knew that the 30-ton hydraulic press had an "incriminating character . . . [that was] immediately apparent." *Banks*, 514 F.3d at 773. "For an item's incriminating character to be immediately apparent, the police merely need probable cause to believe that the item is contraband." *Skokos v. Rhoades*, 440 F.3d 957, 961 (8th Cir. 2006) (citing *Texas v. Brown*, 460 U.S. 730, 741 (1983)). It is commonly accepted by multiple circuits that hydraulic presses are used in the manufacture of various drugs. *See United States v. Clinton*, 243 Fed. Appx. 676, 678 (3d Cir. 2007) (press used in manufacture of cocaine);

*United States v. Archuleta*, 19 Fed. Appx. 827, 828 (10th Cir. 2001) (hydraulic press used for pressing marijuana into bricks); *United States v. Cervantes*, 219 F.3d 882, 892 (9th Cir. 2000) (hydraulic press used for methamphetamine production); *United States v. Villegas*, 899 F.2d 1324, 1330–31 (2d Cir. 1990) (contraband consisted of a "large hydraulic press of the type used in other laboratories for compacting finished cocaine for packaging, storage, and transportation."). The agents recognized the large metal object as a press related to the cutting and repackaging of drugs.

Accordingly, the Court finds that because the object was in plain view, the incriminating nature of the hydraulic press was immediately apparent, and the agents were in a place where they had the right to be, the search satisfies the Fourth Amendment. *Raines*, 243 F.3d at 422. The Court finds that the government has met its burden of proof that the plain view exception to a search warrant applies here.

## IV. CONCLUSION

The Court finds that the agents permissibly intruded into the curtilage of the defendant's residence. *See Dunn*, 480 U.S. at 301. Because entrance was permissible pursuant to a legitimate investigation, *Raines*, 243 F.3d at 420, and the 30-ton hydraulic press was in plain view, *Johnson*, 506 F.2d at 675; *Banks*, 514 F.3d at 773, the Court denies the defendant's motion to suppress the fruits of the entrance onto the curtilage.

Upon the foregoing,

**IT IS ORDERED** the Court denies defendant's Motion to Suppress. [Dkt. No. 61.]

**DATED** this 4th day of June, 2010.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA